ERIC GRANT
United States Attorney
TARA AMIN
Assistant United States Attorney
United States Attorney's Office
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900
Tara.Amin@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TRINITY PUBLIC UTILITIES DISTRICT, and DOES 1-10;<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

The United States brings this action against Trinity Public Utilities District to recover damages, interest, penalties, and costs arising from a wildfire that Trinity Public Utilities District ignited. In support of its claims, the United States alleges as follows:

## INTRODUCTION

1. This action arises out of the wildfire known as the "Hobo Fire," that ignited on United States Forest Service lands approximately four miles north of Helena, California, near Barney Gulch Road within the Forest Direct Protection Area within Trinity County.

2. The Hobo Fire started when electrical equipment owned, maintained, and operated by defendant Trinity Public Utilities District ("TPUD") contacted, or caused electrical current to contact, surrounding vegetation.

3. The Hobo Fire burned approximately 450 acres of National Forest System lands.

4. The United States brings claims for damages against TPUD for suppression and other costs incurred by the United States Forest Service ("Forest Service").

**JURISDICTION AND VENUE**

5. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 because this is a civil action commenced by the United States.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the United States' claims occurred, and a substantial part of the property that is the subject of the action is situated within Trinity County, California, which is within this District.

**PARTIES**

7. The United States, through the Forest Service, holds and manages public lands in trust for the benefit of the public. It is responsible for wildland fire protection in its designated "direct protection areas," which include both the public lands it holds as well as private lands. The United States also owns and manages National Forest System lands in Trinity County, California including the Shasta-Trinity National Forest. The Forest Service protects, controls, supervises, and administers this land.

8. Defendant TPUD is a public utility organized and existing under the laws of the State of California, including but not limited to relevant sections of the California Public Utilities Code. TPUD "is a distribution cooperative that serves the majority of Trinity County in northern California," including approximately 7,322 members and "owns, operates, and maintains a 60 kV transmission and multiple different voltage configurations of distribution system" including "600 miles of overhead lines, 150 miles of underground lines, and nine distribution substations."[1]

9. Defendants Doe 1–10 are individuals and entities, including parents, subsidiaries, employees, agents, contractors, or subcontractors of TPUD, whose identities are currently unknown and who are responsible for the damages caused to the United States as alleged herein.

[1] Trinity Public Utility District (TPUD) 2022-2026 System Improvement Plan, at 3, https://www.trinitypud.com/pdf/system-improvement-plan-2022-2026.pdf (last accessed August 24, 2026).

## FACTUAL ALLEGATIONS

**The Hobo Fire**

10. On August 31 and September 1, 2020, the Redding Interagency Command Center's daily fire danger analysis ranked Shasta-Trinity National Forest as High Fire Danger.

11. The Hobo Fire ignited on August 31, 2020 around 11:00pm on Forest Service lands approximately four miles north of Helena, California, near Barney Gulch Road within the Forest Service Direct Protection Area.

12. On September 1, 2020, Forest Service Patrol Captain Carson Harris and Forest Service Law Enforcement Officer Logan Brown (the "Investigators") performed an origin and cause investigation of the Hobo Fire.

13. In their investigation, the Investigators interviewed Clayton and Erica Crawford, who reside at 1080 Barney Gulch Road, in the area of the Hobo Fire. Around 7:00pm on August 31, 2020, while finishing work outside at their property, the Crawfords heard a large tree falling in the distance and a loud echo from the tree fall carried through the canyon. Around 9:00pm that evening, the Crawfords noted reduced power to their home and that the neighboring property had no power. Between 11:00pm and 1:00am, Erica Crawford smelled smoke outside when she took her dog out. Around 3:30am, the Crawfords were awoken by Forest Service firefighters and evacuated from their home, which was still without power. While evacuating the area, they observed a fire burning along Barney Gulch Road.

14. The Investigators identified that on September 1, 2020 at approximately 1:36am, the Lookout for Forest Service Hayfork Bally, Linda "Annelle" Durham, reported a fire possibly near Backbone Ridge and north of Pigeon Point in the Hobo Gulch area. The report was made to the Redding Interagency Command Center, and the reported fire was named the "Hobo Fire," based on its location.

15. Around 2:55am on September 1, 2020, Cal-Fire Battalion Chief Guy Reiling responded during the initial attack phase of the fire. Beginning at Barney Gulch Road, as part of a safety assessment, Chief Reiling hiked along a utility access road to check for safety concerns associated with energized electrical powerlines. He noted that the utility access road was overgrown with vegetation and showed no recent signs of travel along it.

16. During his assessment, Chief Reiling observed a compromised utility pole with powerlines hanging off the pole. The powerlines were under tension but abnormally low to the ground. He observed that an oak tree had fallen across both powerlines, however after observing the tree and its stump, noticed that the fire did not appear to have caused the tree to fall as fire intensity was low in this area. Investigators later determined that this was within the general origin area.

17. At approximately 5:35am on September 1, TPUD personnel arrived and advised the Forest Service that the conductors were now de-energized within the fire area and that a breaker "popped" within the utility system at a location west of the fire.

18. Around 1:30pm on September 1, the Investigators entered the footprint of the fire to observe advancing fire pattern indicators. They continued working systematically to evaluate the advancing fire characteristics until they observed a portion of the TPUD powerlines that appeared to be lying on the ground underneath a fallen oak tree. This is the same fallen oak tree that was observed by Chief Reiling. Because the macroscale fire pattern indicators in that area still suggested that the fire advanced from further southwest and downslope, the Investigators continued to follow the fire pattern indicators to the south and west.

19. Investigators continued identifying fire pattern indicators within the general origin area until they identified the specific origin area. Within the specific origin area, the Investigators observed that the southern-most electrical powerline, which spans between TPUD utility poles #012497 and #012498, was downed. A portion of this downed line was touching the ground and laying across a bush that was fully consumed by the fire as shown in Figure 1.



**Figure 1: A portion of the downed TPUD south line between poles #012497 and #012498**

20. At the beginning of the downed line, there was visible sooting on the east side of the line as it lay in a north-south fashion, amidst overgrown vegetation that had not been appropriately cleared. Another bush touching the downed line had a char line which was consistent with an electrical resistance scar, a likely result of electricity attempting to conduct itself through the vegetation. The electrical resistance scar ended in the approximate upper two thirds of the stem of the bush. The majority of the lower one

third of the stem appeared to be charred from low intensity ground fire. From the end of the electrical resistance scar to the top of the ground fire char, the bush appeared to have no visible fire damage. Having a break in damage on the stem indicated the electrical resistance scar was the result of a charged powerline coming into contact with the bush.



**Figure 2: The downed TPUD powerline on bush with electrical resistance scar**

21. The Forest Service identified two probable ignition areas, where a competent heat source came into direct contact with readily combustible vegetative fuels, resulting in separate ignitions, as shown in Figure 3 below. The first ignition area was the stem of the bush in contact with the downed TPUD powerline. The second was the frayed metal fragments and melted metal from the downed TPUD powerline where it contacted the vegetation ground fuel. Figure 3 below shows both probable ignition sources.



**Figure 3: Downed TPUD powerline with green flags marking probable ignition sources**

22. The Investigators examined the previously identified oak tree which had fallen across two parallel sections of powerlines east of TPUD pole #012498 (shown in Figure 4, below). The tree's canopy still contained a notable amount of green foliage, while the base of the oak tree, which was separated from its root system, was visibly compromised by rot. The entire bole of the tree was decayed and absent, with the exception of a ring of barkwood that was a few inches thick in most places. The portions of the tree that came into contact with the TPUD powerlines displayed signs of heat transfer, in that the convex shape of the powerline was embedded as a concave shape within the charred portions of each of the oak limbs. The Investigators determined that the oak tree fell prior to the two ignition areas within the specific origin area, based on the visible fire pattern indicators that surrounded the oak tree, and that the fallen oak tree compromised the integrity of the entire utility infrastructure, which directly contributed to the ignition of the Hobo Fire.



**Figure 4: Fallen oak tree across TPUD powerlines in general origin area**

23. The Forest Service investigation ruled out all categories of potential ignition sources other than TPUD powerlines.

24. After gathering witness statements and evaluating fire pattern indicators in the surrounding area, the Forest Service concluded that the TPUD powerlines were the probable cause of the Hobo Fire. The fallen oak tree should have been removed based on clear indications of rot, but it was left in place and

fell onto TPUD powerlines. The fallen oak tree compromised the integrity of the utility infrastructure, which caused charged powerlines and metal fragments to fall between TPUD utility poles #012497 and #012498, onto vegetation that should have been cleared but was not. In sum, the Hobo Fire ignited when electrical equipment owned, maintained, and operated by TPUD contacted, or caused electrical current to contact, surrounding vegetation.

**Duties of TPUD**

25. As a regulated public entity operating power grids on federally owned and administered lands in the State of California, TPUD has duties under common law, state, and federal rules and regulations, and a Special Use Permit issued to TPUD by the Forest Service.

26. TPUD had various duties under applicable California state statutes, rules, and regulations to: avoid causing fires; reasonably and safely maintain, inspect, operate, and repair their power line equipment; and keep vegetation properly trimmed and maintained.

27. In the construction, repair, maintenance, inspection, and operation of its equipment and power lines, TPUD had duties to comply with state statutes, regulations, and other standards, including but not limited to:

a. California Public Resource Code § 4292 (requiring "any person that owns, controls, operates, or maintains any electrical transmission or distribution line" on vegetation-covered lands to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower");

b. California Public Resource Code § 4293 (requiring "any person that owns, controls, operates, or maintains any electrical transmission or distribution line" on vegetation-covered lands to "maintain a clearance of the respective distances which are specified in this section in all directions between all vegetation and all conductors which are carrying electric current");

c. California Public Utilities Code § 451 (public utilities to furnish and maintain reasonable service, instrumentalities, equipment, and facilities as necessary to promote safety and

health of patrons and public); § 8387(a) ("Each local publicly owned electrical utility and electrical cooperative shall construct, maintain, and operate its electrical lines and equipment in a manner that will minimize the risk of wildfire posed by those electrical lines and equipment.");

d. 36 Code of Federal Regulations § 261.5 (prohibiting, among other actions, "[c]arelessly or negligently throwing or placing any ignited substance or other substance that may cause a fire"; "[c]ausing timber, trees, slash, brush or grass to burn except as authorized by permit"; "[l]eaving a fire without completely extinguishing it"; and "[c]ausing and failing to maintain control of a fire that is not prescribed that damages the National Forest System");

e. 36 Code of Federal Regulations § 261.9(a) (prohibition on "damaging any natural feature or other property of the United States");

f. 36 Code of Federal Regulations § 261.10(l) (prohibition on "[v]iolating any term or condition of a special-use authorization, contract or approved operating plan");

g. California Public Utilities Commissions General Orders 95 and 165;

h. TPUD's December 12, 2019 Wildfire Mitigation Plan, which outlined and made representations regarding TPUD's vegetation management plan, including "Circuits are patrolled and maintained on an ongoing basis, enabling the District to cover all lines on a rotating three-year cycle. Contracts are awarded to outside vegetation management contractors to conduct this work. These processes are in compliance with Federal FAC 003-4 and State regulations, including Public Resources Codes section 4292 and 4293; they also meet or exceed the standards in [California Public Utilities Commissions General Orders] 95 Rule 35. TPUD utilizes the 2008 'Power Line Fire Prevention Field Guide' in establishing its pole clearing practices. Contracts for vegetation management signed for one year, with up to 3, one-year extensions. TPUD has approximately 12,000 poles in its service area, making the tree trimming budget the largest expense for the District."[2]

[2] Trinity District Utilities District, 2020 Wildfire Mitigation Plan ("2020 WMP"), at 47–48,

28. The power lines that ignited the Hobo Fire are “device[s] which may kindle a fire” within the meaning of California Public Resource Code § 4435.

29. Pursuant to California Public Resource Code § 4435, the ignition of the Hobo Fire by TPUD’s powerlines is prima facie evidence of TPUD’s negligence in the maintenance, operation, or use of the power lines.

30.  TPUD knew or should have known that, in complying with these the applicable duties and standards including but not limited to those listed in paragraphs above, it had (1) a duty to identify foreseeable hazards; (2) a duty to operate its lines, including maintaining clearance areas, in a manner to minimize the risk of wildfire; and (3) a duty to identify, assess, and mitigate wildfire risks stemming from the operation of its electrical equipment.

31. TPUD failed to comply with these applicable duties and standards. The Hobo Fire was caused because TPUD negligently: (a) failed to prudently and safely inspect, maintain, and operate the electrical equipment in its utility infrastructure; (b) failed to fell, cut, or trim dead trees, old decadent or rotten trees, trees weakened by decay or disease, and trees or portions thereof that are leaning toward a conductor or that may contact the conductor from the side or may fall on the conductor; (c) failed to maintain the appropriate clearance area between the electrical equipment in its utility infrastructure and surrounding vegetation; and/or (d) failed to conduct reasonably proper and frequent inspections and maintenance of its overhead electrical equipment.

32. The United States is informed and believes that the Hobo Fire was caused by two ignition areas: first, a downed TPUD powerline contacted and ignited the stem of a bush, and second, the frayed metal fragments and melted metal from the downed TPUD powerline also contacted and then ignited ground fuel. The fallen oak tree in the general origin area compromised the integrity of the entire TPUD utility infrastructure.

---

https://energysafety.ca.gov/wp-content/uploads/docs/misc/wsab/pou-and-coop-wmps/trinity-wmp-ie-report-6.12.2020.pdf (last accessed August 24, 2026).

**Special Use Permit**

33. TPUD operated and maintained the subject power lines, which caused the Hobo Fire to ignite on National Forest System lands, pursuant to the Special Use Permit (Holder No. 1074-01) Forest Service Handbook 2709.11 (the "Permit"), issued by the Forest Service.

34. TPUD accepted all the terms and conditions contained in the Permit and its amendments.

35. At all times material to this action, the Permit and its terms and conditions were authorized by law, including 43 U.S.C. §§ 1761, 1764(h)(1) & (2), and 1765, and 36 C.F.R. §§ 251.53 and 251.56.

36. Pursuant to paragraph 3 of the Permit, TPUD is obligated to "keep the areas beneath the powerlines cleared and shall trim all branches in contact or near contact with the line. All trees, live or dead, deemed by the holder to be hazardous or which might fall in contact with the line, whether on or adjacent to the right-of-way, shall be removed by the holder…."

37. Pursuant to paragraph 5 of the Permit, TPUD is obligated to "protect the scenic and esthetic values of the right-of-way and the adjacent land as far as possible consistent with the authorized use, during the construction, operation, and maintenance of the facility."

38. Pursuant to paragraph 9 of the Permit, TPUD is obligated to "maintain said powerlines or lines in such manner as not to menace life or property."

39. Pursuant to paragraph 12 of the Permit, TPUD is obligated to "do everything reasonably within its power and shall require its employees, contractors, and employees of contractors to do everything reasonably within their power, both independently and upon request of the Forest Service, to prevent and suppress fires on the lands to be occupied under this permit."

40. Pursuant to paragraph 23 of the Permit, TPUD is obligated to "indemnify the United States against any liability for damage to life or property arising from the occupancy or use of National Forest lands under this permit."

41. Pursuant to paragraph 24 of the Permit, TPUD assumed the risks of natural phenomena in the Forest. TPUD is responsible for "inspecting the site, lot, right-of-way and immediate adjoining areas for dangerous trees, hanging limbs, and other evidence of hazardous conditions and, after securing permission from the Forest Service, of removing such hazards…."

42. Pursuant to paragraph 27 of the Permit, TPUD agreed to the following strict liability provision; "With respect to each overhead powerline and overhead segment of powerline authorized, [TPUD] shall be held liable of all injury, loss, or damage, including fire suppression costs, directly or indirectly resulting from or caused by [TPUD's] use and occupancy of the area covered by permit, regardless of whether the holder is negligent or otherwise at fault, provided that the maximum liability without fault shall not exceed $1,000,000 for any one occurrence and provided further that [TPUD] shall not be liable without fault when such injury, loss, or damage results wholly, or in part, from a negligent act of the United States, or an act of a third party not involving the facilities of [TPUD]." Furthermore, TPUD agreed that "[l]iability for injury, loss, or damage, including fire suppression costs, in excess of the specified maximum, shall be determined by the laws governing ordinary negligence."

43. TPUD breached the terms and conditions of the Permit. TPUD failed to: (a) keep the areas beneath the powerlines cleared and/or trim all branches in contact or near contact with the line; (b) remove all trees, live or dead, that are hazardous or which might fall in contact with the line, whether on or adjacent to the right-of-way; (c) protect the scenic and esthetic values of the right-of-way and the adjacent land as far as possible consistent with the authorized use, during the construction, operation, and maintenance of the facility; (d) maintain its powerlines or lines in such manner as not to menace life or property; (e) do everything reasonably within its power and shall require its employees, contractors, and employees of contractors to do everything reasonably within their power, both independently and upon request of the Forest Service, to prevent and suppress fires on the lands to be occupied under the permit; (f) indemnify the United States against any liability for damage to life or property arising from the occupancy or use of National Forest lands under the permit; (g) inspect the site, lot, right-of-way and immediate adjoining areas for dangerous trees, hanging limbs, and other evidence of hazardous conditions and, after securing permission from the Forest Service, of removing such hazards; and/or (h) take action consistent with its agreement to be held strictly liable for all injury, loss, or damage, including fire suppression costs, directly or indirectly resulting from or caused by TPUD's use and occupancy of the area covered by permit, regardless of whether the TPUD is negligent or otherwise at fault, provided that the maximum liability without fault shall not exceed $1,000,000 for any one occurrence.

**Failure of TPUD**

44. TPUD knew about the potential danger of wildfires in its service area. In its 2020 Wildfire Mitigation Plan, TPUD stated that "[t]he majority of TPUD service area falls within the Tier 2 areas," which constitutes "elevated fire risk."[3]

45. In the same report, TPUD recognized that some of the wildfire risk is associated with the age of its infrastructure, and "thick vegetation and a high tree mortality rate."[4]

46. As part of its wildfire prevention strategy and programs, TPUD represented that it regularly inspected its powerlines and electrical equipment over a multi-year period; "[Detailed Line Inspections] are performed on a five-year schedule on all overhead distribution equipment and pad mounted equipment, and every three years on underground equipment."[5]

47. Between August 3 and 7, 2020, prior to ignition of the Hobo Fire, the Electric Safety and Reliability Branch ("ESRB") of the California Public Utilities Commissions ("CPUC") conducted an audit inspection of TPUD's facilities and equipment and reviewed pertinent documents and records (the "ESRB Audit"). On September 14, 2020, CPUC sent a copy of its audit findings to TPUD, detailing violations of the following reporting and field requirements:[6]

a. General Order (GO) 95, Rule 18-B, Maintenance Programs, GO 95, Rule 31.1, Design, Construction and Maintenance; GO 128, Rule 17.1, Design, Construction and Maintenance (ESRB Audit: "ESRB staff reviewed completed and cancelled/abandoned work orders from the last 12 months (July 2019- July 2020); however, TPUD could not produce any late work orders from the last 60 months as requested… ESRB determined the following deficiencies in TPUD's maintenance records: 1.1) TPUD failed to assign priorities and required completion dates to the provided work orders. 1.2) TPUD was unable to provide work orders completed prior to July 2019 despite TPUD's Preventative

---

[3] 2020 WMP, at 24.

[4] *Id.* at 21–22.

[5] *Id.* at 43.

[6] State of California Public Utilities Commission, Audit of Trinity Public Utilities District EA2020-874 (September 14, 2020), https://webtraininga.cpuc.ca.gov/-/media/cpuc-website/files/uploadedfiles/cpuc_public_website/content/safety/electric_safety_and_reliability/reports_and_audits/electric_facilities/ea2020-874.pdf (last accessed August 24, 2026).

Maintenance Plan stating, "completed maintenance tags will be kept in a file for five years. 1.3) TPUD was unable to provide safety and reliability metrics as well as sustained outage data. TPUD is unable to confirm it is furnishing safe, proper, and adequate service without the data.");

b. GO 95, Rule 31.2, Inspection of Lines; GO 128, Rule 17.2, Inspection; GO 165, Section III-B, Standards for Inspection; GO 165, Section III-C, Record Keeping (ESRB Audit: "ESRB reviewed the inspection records provided by TPUD and found the following: 2.1) TPUD's inspection records do not show a complete overhead inspection cycle. TPUD provided system statistics that show 12,330 poles. In the Electronic Inspection List provided, TPUD logged inspections on approximately 9078 overhead poles in six years. TPUD's Preventative Maintenance Plan says a full overhead inspection cycle takes place over 5 years, so ESRB would expect to see at a minimum all 12,330 poles inspected. Additionally, it is reasonable to expect another 20% of the poles inspected for the sixth year, bringing the total number of expected pole inspections to 14,769. 2.2) TPUD failed to provide any records showing that the underground inspections are being performed every 3 years. 2.3) TPUD failed to provide any records showing that the yearly patrols are being performed. 2.4) TPUD also failed to provide training procedures and qualification records of its personnel who perform inspections, patrols, and maintenance.");

c. GO 95, Rule 31.1, Design, Construction and Maintenance (ESRB Audit: identified 16 poles with damage, based on in-field inspection);

d. Public Resources Code Chapter 3 Mountainous, Forest-, Brush- and Grass-Covered Lands 4292 (ESRB Audit: identified 20 violations of vegetation growing within 10 feet of pole, based on in-field inspection);

e. GO 95, Rule 34, Foreign Attachments (ESRB Audit: identified three poles with foreign no trespassing signs attached, based on in-field inspection);

f. GO 95, Rule 35, Vegetation Management (ESRB Audit: identified a pole with service drop going through trees and another pole with service drop with multiple points of deflection and abrasion, based on in-field inspection);

g. GO 95, Rule 51.6-A, High Voltage Marking (ESRB Audit: identified five poles with high voltage signs missing, based on in-field inspection);

h. GO 95, Rule 54.6-B, Vertical and Lateral Conductors, Ground Wires (ESRB Audit: identified two poles with missing or broken ground cover, based on in-field inspection)

i. GO 95, Rule 37, Minimum Clearances of Wires above Railroads, Thoroughfares, Buildings, Etc., Table 1, Case 14E (ESRB Audit: identified poles or spans between poles with less than 4 feet clearance between vegetation and primary conductors, based on in-field inspection);

j. GO 95, Rule 56.6-A, Guys in Proximity to Supply Conductors of Less than 35,500 Volts (ESRB Audit: identified seven poles with vegetation contacting anchor guy above the guy bob, based on in-field inspection);

k. GO 95, Rule 56.2, Overhead Guys, Anchor Guys and Span Wires, Use (ESRB Audit: identified seven guys with slack, based on in-field inspection).

**Damages to Plaintiff**

48. The Forest Service conducted fire suppression efforts to extinguish the Hobo Fire, which continued until September 10, 2020. Those efforts included engines, hand crews, and air support.

49. The fire burned approximately 450 acres of National Forest System lands within the Shasta-Trinity National Forest.

50. On September 28, 2021, the Forest Service sent TPUD a notice of indebtedness and a bill for collection for $2,351,295.93 for fire suppression costs.

51. The September 28, 2021 notice of indebtedness satisfied the timely presentation of a written claim for tort and contract causes of action to TPUD under California Government Code § 911.2. *See* Executive Order N-08-21, at ¶ 7.e (June 11, 2021) ("[c]laims accruing before June 30, 2021 will remain subject to the 120-day extension granted in the aforementioned orders); Executive Order N-71-20, at ¶ 6

(June 30, 2020); Executive Order N-65-20, at ¶ 10 (May 19, 2020); Executive Order N-35-20, at ¶ 11 (March 21, 2020).

52. To date, no Defendant has paid any part of the sum demanded by the United States.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### (Negligence under Federal Common Law – Against All Defendants)

53. The United States realleges the allegations above as if fully set forth herein.

54. On August 31, 2020, TPUD negligently and in violation of its obligations under federal laws and regulations including, but not limited to, 36 Code of Federal Regulations §§ 261.5, 261.9 and 261.10; Federal Land Policy Management Act, 43 U.S.C. §§ 1701 et seq., 1733(b) and (g), and 1765, and applicable regulations thereto; the National Forest Management Act, and application regulations thereto; the Organic Administration Act, including but not limited to 16 U.S.C. § 551, and applicable regulations thereto, ignited the Hobo Fire, thereby setting fire to or allowing fire to be set to National Forest System lands within Shasta-Trinity National Forest. Under these laws, TPUD had a duty to maintain its rights of ways, and to maintain and inspect its equipment and/or land used under the Permit. Its failure to do so was a breach.

55. The United States is further entitled to a presumption of negligence under the doctrine of *res ipsa loquitur*, because (1) the ignition and spread of the Hobo Fire was an incident of the kind that ordinarily does not occur in the absence of negligence, (2) the Hobo Fire was caused by an agency or instrumentality within the exclusive control of Defendants, and (3) the United States did not cause or contribute to the ignition of the Hobo Fire.

56. TPUD had a duty of care to properly inspect and maintain the power lines, equipment, and vegetation in the area of the subject power lines. TPUD also had a duty to avoid causing fires. TPUD's breach of its respective duties caused the ignition of the Hobo Fire.

57. TPUD's negligent acts, omissions, and violations of law caused the Hobo Fire to ignite and proximately caused the damages the United States sustained.

58. TPUD's negligence, on its own and through its agents and employees, was a substantial factor in, and the proximate cause of, the Hobo Fire.

59. The Hobo Fire destroyed property of the United States and caused the United States to incur fire suppression costs and other damages to be established at trial.

60. Because TPUD breached its duties, the United States is entitled to restitution as a result of TPUD's breach.

61. TPUD is liable for all damages to the United States resulting from the Hobo Fire, including its fire suppression costs and other damages, and the United States administrative, investigative, accounting, and collection costs, in an amount to be established at trial.

62. The United States is informed and believes that Does 1-10 are similarly responsible and liable for the United States' damages resulting from the Hobo Fire.

**SECOND CLAIM FOR RELIEF**

**(Strict Liability Pursuant to Special Use Permit – Against TPUD)**

63. The United States realleges the allegations above as if fully set forth herein.

64. TPUD is strictly liable for up to $1,000,000 to the United States for all injury, loss, or damage, including fire suppression costs as a result of the Hobo Fire, directly or indirectly caused by TPUD's use and occupancy of the area covered by the Permit, regardless of whether TPUD was negligent or otherwise at fault. The amount of injury, loss, or damage will be established at trial.

**THIRD CLAIM FOR RELIEF**

**(Indemnity Pursuant to Special Use Permit – Against TPUD)**

65. The United States realleges the allegations above as if fully set forth herein.

66. TPUD agreed, among other obligations, to be subject to and abide by the terms and conditions of the Permit. TPUD agreed to indemnify the United States against any liability for damage to life or property arising from the occupancy or use of National Forest lands under this permit.

67. The Hobo Fire resulted from TPUD's occupancy and use of National Forest lands under the Permit.

68. Under the terms of the Permit, TPUD is liable to the United States for damages resulting from the Hobo Fire, in an amount to be established at trial.

**FOURTH CLAIM FOR RELIEF**

**(Breach of Special Use Permit – Against TPUD)**

69. The United States realleges the allegations above as if fully set forth herein.

70. Title 36 of the Code of Federal Regulations § 261.10 prohibits the violation of any term of condition of a special-use authorization, contract, or approved operating plan.

71. TPUD breached its obligations to the United States under the Permit in connection with the Hobo Fire, including its obligation to protect the land and property of the United States from damage, and to indemnify the United States for damage to property arising from TPUD's occupancy and use of National Forest System lands.

72. As a result of these breaches by TPUD, the United States incurred damages in an amount to be established at trial. TPUD is liable to the United State for these damages.

**FIFTH CLAIM FOR RELIEF**

**(Nuisance – All Defendants)**

73. The United States restates the above allegations as if fully set forth herein.

74. TPUD's conduct was unreasonable, particularly in light of the seriousness of the harm to the public.

75. TPUD created hazardous conditions that affected a substantial number of people within the general public and constituted a public nuisance under California Civil Code §§ 3479, 3480 and 3481 and California Public Resources Code § 4171. *See, e.g., Paterno v. State of California,* 74 Cal. App. 4th 68, 103 (Cal. Ct. App. 1999) ("But the California Supreme Court has held Civil Code section 3479 is a statute that provides liability against public entities which maintain nuisances."). Further, the ensuing uncontrolled wildfires constituted a public nuisance under California Public Resources Code § 4170.

76. TPUD's actions, conduct, omissions, negligence, trespass, and failure to act resulted in a fire hazard and a foreseeable obstruction to the free use of the United States' property, invaded the right to use the United States' property and interfered with the enjoyment of United States' property, causing the Forest Service to suffer unreasonable harm and substantial actual damages constituting a nuisance.

77. A reasonable, ordinary person would be reasonably annoyed or disturbed by the condition created by TPUD and the resulting fire.

78. The United States did not consent, expressly or impliedly, to the wrongful conduct of TPUD in acting in the manner set forth above.

79. The United States has standing to maintain an action for public nuisance because the nuisance was especially injurious to National Forest System lands and unlawfully obstructs the free use, in the customary manner, of those lands.

80. The potential harms to the United States from wildfires such as the Hobo Fire were objectively foreseeable both in nature and in scope and were subjectively known to TPUD.

81. As a direct and proximate result of TPUD's actions and omissions, the United States incurred costs and suffered damages in an amount to be proved at trial.

82. The United States is informed and believes that Does 1-10 are similarly responsible and liable for the United States' damages resulting from the Hobo Fire.

**SIXTH CLAIM FOR RELIEF**

**(Dangerous Condition of Property California Government Code Section 835 – All Defendants)**

83. The United States restates the above allegations as if fully set forth herein.

84. At the time TPUD ignited the Hobo Fire, TPUD's electrical infrastructure and facilities were in a dangerous condition. The malfunctioning and/or defective TPUD electrical infrastructure and powerlines that ignited the Hobo Fire constitutes a "device which may kindle a fire" within the meaning of California Public Resources Code § 4435.

85. The Hobo Fire, and the resulting damages and costs borne by the United States, were directly and proximately caused by the dangerous condition of TPUD's electrical infrastructure and powerlines, and TPUD's failure to maintain the surrounding area. These dangerous conditions created a reasonably foreseeable risk of igniting a fire in vegetation, which was what happened when TPUD's powerlines caused the ignition of the Hobo Fire.

86. A negligent or wrongful act or omission by one or more of TPUD's employees, which took place within the course and scope of their TPUD employment, created these dangerous conditions. Pursuant to California Resource Code § 4435, the origination of the Hobo Fire from TPUD's operation and/or use of its electrical infrastructure and powerlines within the Shasta-Trinity National Forest is prima facie

evidence of TPUD's and TPUD's employees' negligence in the maintenance, operation, inspection, and/or use of TPUD's electrical infrastructure, equipment, powerlines, and the surrounding area.

87. TPUD had actual or constructive knowledge and notice of all dangerous conditions at a time sufficiently prior to the ignition of the Hobo Fire, such that TPUD could have taken measures to protect against these dangerous conditions before the condition causing the Hobo Fire occurred.

88. The ignition of the Hobo Fire was an incident of a kind that ordinarily does not occur in the absence of someone's negligence, it was caused by activity and an instrumentality within the exclusive control of TPUD, and it was not due to any act or omission on the part of the United States. Therefore, *res ipsa loquitur* applies to this case under California Government Code § 830.5.

89. Pursuant to California Government Code § 835, TPUD is therefore liable to the United States for all damages resulting from the Hobo Fire.

90. The United States is informed and believes that Does 1-10 are similarly responsible and liable for the United States' damages resulting from the Hobo Fire.

**SEVENTH CLAIM FOR RELIEF**

**(Interest and Penalties - Against All Defendants)**

91. The United States realleges the allegations above as if fully set forth herein.

92. Notwithstanding its entitlement to any other damages against TPUD, the United States is entitled to recover its administrative, investigative, accounting, and collection costs, as well as interest and late payment charges, in addition to other damages arising from the Hobo Fire pursuant to California Civil Code § 3287, 7 CFR 3.17, and 31 USC § 3717.

93. The United States has demanded that TPUD pay the costs and damages incurred by the United States due to the Hobo Fire. Defendants have not paid any part of the sum the United States demanded.

94. The United States is informed and believes that Does 1-10 are similarly responsible and liable for the United States' damages resulting from the Hobo Fire.

**PRAYER FOR RELIEF**

WHEREFORE, the United States demands that judgment be entered in its favor against Defendants:

1. For damages in an amount to be determined at trial incurred by the United States as a result of the Hobo Fire, including all the United States' fire suppression, investigative, accounting, collection, administrative, and other costs resulting from the fire;

2. For interest and penalties allowable under the law;

3. For costs of this action;

4. For other applicable costs, fees, and interest; and

5. For such other and further relief as the Court deems just and proper.

Dated: August 24, 2026

Respectfully submitted,

ERIC GRANT
United States Attorney

*/s/ Tara Amin*
TARA AMIN
Assistant United States Attorney

**DEMAND FOR JURY TRIAL**

The United States hereby demands a jury trial for all issues so triable in this action.

Dated: August 24, 2026

Respectfully submitted,

ERIC GRANT
United States Attorney

*/s/ Tara Amin*
TARA AMIN
Assistant United States Attorney